Filed 8/11/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                    )
                                               )
    Plaintiff and Respondent,          )
                                               )           S179181
        v.                              )
                                               )      Riverside County
MICHAEL RAY BURGENER,                          )   Super. Ct. No. CR 18088
                                               )
    Defendant and Appellant.           )
_____)


In 1981, Michael Ray Burgener was convicted of murdering William Arias during a convenience store robbery and sentenced to death. We affirmed the guilt judgment but reversed the penalty verdict because defense counsel at Burgener's request "deliberately refrained from introducing any evidence in support of a lesser penalty than death, though such evidence was available." (*People v. Burgener* (1986) 41 Cal.3d 505, 542 (*Burgener I*), disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743; but cf. *People v. Bloom* (1989) 48 Cal.3d 1194, 1228, fn. 9 (*Bloom*) [disapproving the rule that "failure to present mitigating evidence in and of itself is sufficient to make a death judgment unreliable"].)

At the penalty retrial, a jury again sentenced Burgener to death, but the trial court modified the sentence from death to life imprisonment without the possibility of parole. (See Pen. Code, § 190.4, subd. (e) (hereafter section 190.4(e)); all undesignated statutory references are to the Penal Code.) The Court of Appeal reversed on the ground that the trial court, in ruling on the section 190.4(e) motion to modify the verdict, had considered

several impermissible factors. (*People v. Burgener* (1990) 223 Cal.App.3d 427, 430 (*Burgener II*).) The case was remanded to the trial court for reconsideration of the section 190.4(e) motion.

On remand, the judge who had presided over the penalty retrial, Judge Mortland, had retired. So the case was assigned to Judge Heumann, who proceeded to deny the motion to modify the verdict. On appeal, we held that Judge Heumann, in reviewing the jury's sentencing decision, mistakenly applied a deferential standard of review instead of exercising "his duty to independently reweigh the evidence and make an independent determination whether the evidence supported the verdict of death." (*People v. Burgener* (2003) 29 Cal.4th 833, 891 (*Burgener III*).) We therefore vacated the death judgment and remanded for another hearing on Burgener's application to modify the verdict. (*Id.* at p. 892.)

On remand, the trial court granted Burgener's request to represent himself at the section 190.4(e) hearing but ultimately denied his application to modify the verdict and reinstated the death judgment. On appeal, we found that the trial court did not adequately warn Burgener of the risks of self-representation. (*People v. Burgener* (2009) 46 Cal.4th 231, 241–243 (*Burgener IV*).) Because we could not "conclude that defendant's waiver of counsel was knowing and intelligent," we vacated the death judgment and remanded "for yet another hearing on the application for modification of the death penalty verdict." (*Id.* at pp. 243, 245.) We observed that "[b]ecause Judge Heumann has since passed away, the motion shall be heard before another judge of the same court." (*Id.* at p. 245.)

On remand, the case was assigned to Judge Riemer, who granted Burgener's request to represent himself but denied his application to modify the verdict. Before us now is the automatic appeal from this latest denial of Burgener's application to modify the verdict. (§ 1239, subd. (b).) For the reasons that follow, we affirm the death judgment.

2

## I.

Burgener contends that the trial court erred in granting his request to represent himself because his request was equivocal and because the court inadequately warned him of the risks of self-representation.

As noted, the last time Burgener was before this court, we held that the trial court granted his motion for self-representation without adequately warning him of its risks. (*Burgener IV*, *supra*, 46 Cal.4th at p. 243.) We reaffirmed that " ' "[n]o particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." ' " (*Id.* at p. 241.) But we observed that "the trial court not only failed to advise defendant that the district attorney would be both experienced and prepared, that defendant would receive no special consideration or assistance from the court and would be treated like any other attorney, that he would have no right to standby or advisory counsel, or that he would be barred from challenging on appeal the adequacy of his representation, but instead actively encouraged defendant to represent himself." (*Id*. at p. 243.) This time the colloquy on self-representation proceeded as follows:

"THE COURT:  [T]he first order of business today is to determine whether Mr. Burgener still wishes to represent himself or whether he is going to accept the services of the Public Defender's Office to represent him.

"So Mr. Burgener, what do you wish to do today?

"THE DEFENDANT:  For the purposes of the hearing I'm down here for, I wish to represent myself.

"THE COURT:  All right.  Sir, have you ever studied law before?

"THE DEFENDANT:  No.

"THE COURT:  Have you, other than those proceedings in front of Judge Heumann which ultimately were reversed by the Supreme Court, have you ever represented yourself in a criminal action?

"THE DEFENDANT:  Just — no.

3

"THE COURT: Do you understand the issues that are present in this motion to modify the judgment?

"THE DEFENDANT: Yes, I do.

"THE COURT: And to your understanding, what are those issues?

"THE DEFENDANT: The issues that I'm down here for?

"THE COURT: Yes.

"THE DEFENDANT: I'm down here for the automatic motion to modify the penalty from death to life.

"THE COURT: Right. But what are the legal issues that are to be decided in whether I grant that motion or whether I deny that motion? Do you understand that?

"THE DEFENDANT: You're to weigh the mitigating, aggravating circumstances against each other and determine whether the jury's findings were enough to give me death.

"THE COURT: Okay.

"THE DEFENDANT: Or whether you should overturn it to life without.

"THE COURT: Do you realize that if you do represent yourself that you will be going up against one of the most experienced prosecutors in the Riverside County District Attorney's Office?

"THE DEFENDANT: Yes.

"THE COURT: Do you realize that I cannot give you any advice?

"THE DEFENDANT: Yes, or any help, yes, I do.

"THE COURT: And do you realize that you're going to basically not be cut any slack just because you're representing yourself as opposed to being represented by an attorney?

"THE DEFENDANT: I realize that whether I have the top criminal defense attorney in the world or myself, what was going to happen — what is going to happen is going to happen regardless. I realize that.

4

"THE COURT: What do you mean by that, sir?

"THE DEFENDANT: I mean what I'm down here for, the limited scope of what you're to determine is going to be determined the same way that it's been determined all along.

"THE COURT: It's been determined two different ways. One judge granted it, another judge denied it.

"THE DEFENDANT: The judge who granted it was the judge who actually set at the penalty phase and heard the witnesses, heard all the evidence. What you're going to rule on is going to be by the record, what you read.

"You haven't heard the witnesses. You didn't sit into the penalty phase. You're only going to go by the record. So by the record, I'm going to be given the same sentence. I realize that. I know what the record is, and the mitigating — I mean the aggravating circumstances do outweigh the mitigating circumstances, but, again, you're not going to be able to hear the witnesses. You're not going to be able to make the determination that Judge Mortland made.

"THE COURT: I see. There is a common saying in legal circles that a person who represents themselves has a fool for a client. What that means —

"THE DEFENDANT: I understand what that means.

"THE COURT: What that means is that — or what that saying is a reflection of is an understanding by judges and lawyers alike, that it is a bad idea, even for a lawyer to represent himself. It is a particularly bad idea for a — for a layperson, someone who is not schooled in the law, to attempt to represent themselves.

"You have — what I hear you saying is it's not going to make any difference. I'm confident what the ruling is going to be, therefore, I prefer to represent myself.

"Let me ask you, the — if the decision is going to be the same in your mind either way, what is the downside of accepting Mr. Kersee's representation?

5

"THE DEFENDANT:  The downside is the length of time that it's going to take. My case has been in the State courts for — well, you know the number of years it's been in the State court.

"I can't sit here before you or anybody else or let anybody — I've had no say in what's happened here throughout this case.  All the lawyers I've had have always done what they wanted to do.  Take the penalty phase, for instance, I can't in good conscience, try to mitigate a sentence when I'm claiming I'm innocent.

"How can I let an attorney do the things that they do to try to mitigate a sentence of death?  To me, a sentence of life without is worse than death, actually, to me right now where my case is in the courts.  I want to get this hearing over with, and, you know, get my case in through the courts before I die of old age.

"THE COURT:  Understandable.  You understand that whether you represent yourself or not, there is not going to be any ruling made today?

"THE DEFENDANT:  I understand that.

"THE COURT:  I have hundreds of thousands of pages of reading to do between now and whenever I make that ruling.

"THE DEFENDANT:  You just have to read the transcripts from the penalty phase, correct?

"THE COURT:  That's my understanding.

"THE DEFENDANT:  So that shouldn't take too long, but I don't know how long it's going to take.  I understand what you're saying, I guess.

"THE COURT:  I want to make sure that your motion was not based on the assumption, if I represent myself, this ruling will be made today, and if I accept —

"THE DEFENDANT:  I understand that.  It's just that I could do — I can do for me just as much as an attorney can do for me.  In other words, what can be done for me is not much at this point for the limited scope of this hearing.

6

"THE COURT: All right, sir. Sir, do you also understand that if you represent yourself, you're not going — if you change your mind midway through the hearing, there's not going to be any other attorney waiting in the wings or sitting at your elbow waiting to take over for you? You might change your mind after the hearing is over, but for purposes of this hearing, your decision is going to be irrevocable. It's either go with an attorney for the entire hearing or ruling or go without an attorney for the entire ruling or hearing.

"THE DEFENDANT: I understand that.

"THE COURT: If the ruling is contrary to you, as you expect it to be, and if that ruling is appealed, then you cannot raise a common argument on appeal that appellants often raise which is my attorney was ineffective. My attorney did not do the reasonably minimum expectable job that an attorney would do for me.

"THE DEFENDANT: Yes, I understand that.

"THE COURT: All right, sir. I have no stake in this case. In fact, I am, until this week, I was entirely new to this case. I have done very little with respect to this case other than read the latest opinion from the California Supreme Court. I have no vested interest one way or the other.

"My advice to you is that you accept Mr. Kersee's representation. He is an excellent attorney. If there is anything that can be done, Mr. Kersee is in an excellent position to make sure that everything that can be done is done.

"I recognize that you think that's a waste of time. I recognize that you think it's a futile effort and the result is going to be the same, but what you think is possible from your review of the record and from what a very experienced criminal trial attorney, one very experienced in death penalty cases, thinks is possible might be two different things. Lightening [*sic*] does strike. So if you are — it appears to the Court, and the Court will find that you understand the risks.

7

"You are competent to make this decision, and if it is your desire to make this —

to choose to represent yourself, I will grant that, but I advise you against it.

"THE DEFENDANT: Your Honor, let me just say this. The very best that can

come of this hearing that I'm down here for is that I be given life without the possibility

of parole. To me, that's the very worst thing that can happen, therefore, I do wish to

represent myself.

"THE COURT: Mr. Kersee, anything before I rule on this request?

"MR. KERSEE [defense counsel]: No. In fact I should, for the record, note that I

have had long conversations with Mr. Burgener regarding his position, regarding what he

wants to do considering the 190.4[(e) hearing]. I have spoken with appellate — both

state and federal appellate attorneys who have represented Mr. Burgener and discussed

the issues with them. After I discussed the issues with them, I went back and spoke with

Mr. Burgener again regarding his decision. I am satisfied that Mr. Burgener is well

aware of the legal principles involved.

"He is aware of the scope of the hearing. He is aware of the duties, obligations of

your Honor with respect to this case, and I acknowledge his Constitutional right to

represent himself.

"THE COURT: Miss Carter, any further inquiry you like to make in order to

confirm that the defendant's decision is knowing and voluntary?

"MS. CARTER [speaking for the prosecution]: No. I would just note for the

record, just because nobody said it, from the cold record, Mr. Burgener's words make

sense, but I watched him have a discussion with the Court. He seems bright. He seems

lucid. He doesn't seem to be strange in any way and he seems to be a rather intelligent

man. So making no judgments about those, I would just indicate for the record that those

are my observations about the — not only the words that were said, but the nature in

which the discussion was undertaken between the Court and the defendant.

8

"THE COURT: And Court would confirm those observations. Mr. Burgener appears to have thought this issue out in a careful and rational manner and has made his choice. It's not the choice that I would make, but it does appear to be a rational choice from his point of view.

"All right, sir, Court will grant your request. The Court finds that you have made a knowing and voluntary choice with full understanding of the risks and consequences involved in representing yourself."

Burgener argues that his request for self-representation was equivocal, and therefore should not have been granted by Judge Riemer, because it was borne of frustration with his case's slow progress and his fatalistic attitude toward the section 190.4(e) hearing's ultimate outcome. (See *People v. Doolin* (2009) 45 Cal.4th 390, 453 ["a request for self-representation must be unequivocal"]; *People v. Marshall* (1997) 15 Cal.4th 1, 23 ["A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied."].) Where a trial court has granted a defendant's request for self-representation, the question on appeal is "whether the defendant knowingly and intelligently waived the right to counsel." (*Burgener IV*, *supra*, 46 Cal.4th at p. 241.) We examine Burgener's claim that his request was equivocal as part of the inquiry into whether he affirmatively made a knowing and intelligent waiver of his right to counsel. We "must indulge every reasonable inference against waiver of the right of counsel." (*Marshall*, at p. 20.)

It is true that Burgener expressed frustration with the progress of his case ("I want to get this hearing over with, and, you know, get my case in through the courts before I die of old age") as well as resignation that "I'm going to be given the same sentence" whether or not represented by counsel. But these sentiments do not suggest equivocation in Burgener's desire to represent himself. Burgener had directed his attorney not to oppose the death penalty during his original penalty trial (*Burgener I*, *supra*, 41 Cal.3d at

9

p. 541), and he had asked to represent himself at the previous section 190.4(e) hearing more than a decade ago (see *Burgener IV*, *supra*, 46 Cal.4th at p. 234). After this court overturned that hearing's outcome, Burgener again asked to represent himself because he wanted to move his case along more quickly, because he objected to his lawyers presenting mitigating evidence ("I can't in good conscience, try to mitigate a sentence when I'm claiming I'm innocent. [¶] How can I let an attorney do the things that they do to try to mitigate a sentence of death?"), and because he believed "I can do for me just as much as an attorney can do for me." The trial court told Burgener that "[i]t is a particularly bad idea . . . for a layperson, someone who is not schooled in the law, to attempt to represent themselves" and that "[m]y advice to you is that you accept Mr. Kersee's representation." Yet Burgener remained resolute, and at the end of the colloquy, the trial court, prosecutor, and defense counsel all agreed, based on their direct observations, that Burgener had made a careful and informed judgment. The record shows that Burgener knowingly and intelligently waived his right to counsel and affirmatively chose to represent himself.

In addition, the trial court did not abuse its discretion in granting Burgener's request in the face of his expressed desire to present no mitigating evidence and leave the death verdict intact. Burgener now contends that his "request for self-representation here was clearly made to frustrate the orderly administration of justice by making the proceedings non-adversarial." But in *Bloom*, we held that a trial court did not abuse its discretion "by granting a competent defendant's midtrial motion for self-representation, when the motion is made for the announced purpose of seeking a verdict of death." (*Bloom*, *supra*, 48 Cal.3d at p. 1220.) We explained that although the "defendant's midtrial motion for self-representation did not have a constitutional basis [citation], the United States Supreme Court's decision in *Faretta v. California* [(1975) 422 U.S. 806], recognizing a Sixth Amendment right of self-representation, is nonetheless instructive on the point raised by defendant. The basic teaching of *Faretta* is 'that the state may not

10

constitutionally prevent a defendant charged with commission of a criminal offense from controlling his own fate by forcing on him counsel who may present a case which is not consistent with the actual wishes of the defendant.' " (*Ibid.*) "Given the importance which the decisions of both this court and the United States Supreme Court have attached to an accused's ability to control his or her own destiny and to make fundamental decisions affecting trial of the action, and given this court's recognition that it is not irrational to prefer the death penalty to life imprisonment without parole," we concluded that "it would be incongruous to hold that a trial court lacked power to grant a midtrial motion for self-representation in a capital case merely because the accused stated an intention to seek a death verdict." (*Id.* at pp. 1222–1223.)

Applying this reasoning here, we cannot say that Burgener sought to frustrate the orderly administration of justice by taking control of his defense, even though his refusal to argue for mitigation and his desire for a swift resolution might have increased the likelihood that he would receive a death sentence. The fact that Burgener had convinced himself that "by the record, I'm going to be given the same sentence" does not suggest that his request to represent himself was ambivalent or intended to undermine the proceedings. Burgener apparently believed he was making the best of the situation by seeking to expedite a process whose outcome was predetermined. Judge Riemer sought to convince Burgener otherwise by saying: "I have no stake in this case. . . . I have no vested interest one way or the other. [¶] . . . [¶] I recognize that you think [accepting counsel is] a futile effort and the result is going to be the same, but what you think is possible from your review of the record and from what a very experienced criminal trial attorney, one very experienced in death penalty cases, thinks is possible might be two different things. Lightening [*sic*] does strike." But Burgener was unconvinced because Judge Riemer had not heard the penalty phase witnesses and Burgener believed the "aggravating circumstances do outweigh the mitigating circumstances" on the written record alone. In persisting with his request to represent himself despite Judge Riemer's

11

contrary advice, Burgener made clear he was seeking "to control his . . . own destiny" (*Bloom*, *supra*, 48 Cal.3d at p. 1222), not to frustrate the orderly administration of justice.

We likewise reject Burgener's contention that Judge Riemer failed to fully apprise him of the dangers of self-representation. "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070.) Judge Riemer actively counseled Burgener against self-representation, warning Burgener that he was "going up against one of the most experienced prosecutors in the Riverside County District Attorney's Office"; that he would "not be cut any slack" as a self-represented defendant; that his self-representation decision "is going to be irrevocable" for purposes of the section 190.4(e) hearing; and that he was forgoing his right to later assert any claim of ineffective assistance of counsel. In light of the deficiencies we noted in the trial court's warnings concerning self-representation at Burgener's previous section 190.4(e) hearing, it is not surprising that Judge Riemer, who said he had "read the latest opinion from the California Supreme Court [i.e., *Burgener IV*]," gave the specific warnings that he did. (See *Burgener IV*, *supra*, 46 Cal.4th at p. 243 [trial court "failed to advise defendant that the district attorney would be both experienced and prepared, that defendant would receive no special consideration or assistance from the court and would be treated like any other attorney, that he would have no right to standby or advisory counsel, or that he would be barred from challenging on appeal the adequacy of his representation"].) Further, unlike Judge Heumann, who had "actively encouraged defendant to represent himself" (*ibid.*), Judge Riemer expressly advised Burgener to accept representation by counsel.

Burgener argues that Judge Riemer did not specifically warn him of the complexities of a section 190.4(e) hearing. The only complexity Burgener identifies is

12

the necessity of objecting when appropriate in order to preserve claims of error for appeal. But such a rule is not unique to a section 190.4(e) hearing, and it is no more complex than the rules of evidence and procedure that a defendant who represents himself at trial is expected to follow without any specific admonition beforehand. As we said in *Burgener IV*, a section 190.4(e) "proceeding differs markedly from a trial on the merits, which involves voir dire of potential jurors, the examination and cross-examination of witnesses, and jury instructions. [Citation.] Indeed, an application for modification of the death penalty verdict is based only on evidence that has already been presented to the jury . . . ." (*Burgener IV*, *supra*, 46 Cal.4th at p. 242.) Judge Riemer's careful colloquy with Burgener was adequate to warn Burgener of the "risks or disadvantages" of self-representation in the section 190.4(e) hearing. (*Burgener IV*, at p. 242.)

Finally, Burgener contends that he had no federal constitutional right to represent himself in the section 190.4(e) hearing, that Judge Riemer had no discretion to allow Burgener to represent himself, and that even if Judge Riemer did have such discretion, that discretion was abused on this record. In *Burgener IV*, our analysis of Burgener's request to represent himself appeared to assume that *Faretta* applies to a section 190.4(e) hearing. (See *Burgener IV*, *supra*, 46 Cal.4th at pp. 240–241, citing *Faretta v. California*, *supra*, 422 U.S. at pp. 835–836 (*Faretta*).) Yet in *Bloom*, we explained that a motion for self-representation made "after trial has commenced" — the motion there was made at the penalty phase, after the verdicts on guilt had been returned — "is 'based on nonconstitutional grounds' [citation] and is addressed to the sound discretion of the trial court." (*Bloom*, *supra*, 48 Cal.3d at p. 1220.) Further, we said "[t]he rule against invited error generally precludes a defendant from obtaining reversal of a judgment by asserting error in the granting of the defendant's own motion." (*Ibid.*)

Burgener argues that Judge Riemer did not have discretion to allow him to represent himself because section 686.1 says that "the defendant in a capital case shall be

13

represented in court by counsel at all stages of the preliminary and trial proceedings."
Under *People v. Johnson* (2012) 53 Cal.4th 519, 526 (*Johnson*), section 686.1's mandate
applies to the extent it is not inconsistent with *Faretta*. Burgener reasons that if *Faretta*
does not apply to a section 190.4(e) hearing and section 686.1's requirement of
representation by counsel does, then we must conclude that the trial court erred in
granting his request for self-representation.

We need not decide whether Burgener had a Sixth Amendment right to self-
representation at the section 190.4(e) hearing; even if had no such right, his claim of error
cannot succeed because section 686.1 does not apply to such a hearing. (See *People v.
Engram* (2010) 50 Cal.4th 1131, 1161 ["a statute must be construed, if reasonably
possible, in a manner that avoids a serious constitutional question"].) The requirement of
section 686.1 applies "at all stages of the preliminary and trial proceedings," and a
section 190.4(e) hearing is not a trial proceeding in the usual sense. As noted, a section
190.4(e) hearing is qualitatively different and less procedurally complex than a trial on
the merits. (See *Burgener IV*, *supra*, 46 Cal.4th at p. 242 ["Such a proceeding differs
markedly from a trial on the merits, which involves voir dire of potential jurors, the
examination and cross-examination of witnesses, and jury instructions. [Citation.]
Indeed, an application for modification of the death penalty verdict is based only on
evidence that has already been presented to the jury . . . ."].)

In *Johnson*, we quoted the Legislature's finding, when it enacted section 686.1,
that " 'persons representing themselves cause unnecessary delays in the trials of charges
against them; that trials are extended by such persons representing themselves; and that
orderly trial procedures are disrupted. Self-representation places a heavy burden upon
the administration of criminal justice without any advantages accruing to those persons
who desire to represent themselves.' (Stats. 1971, ch. 1800, § 6, p. 3898; [citation].)"
(*Johnson*, *supra*, 53 Cal.4th at p. 526.) None of these concerns has salience in a section
190.4(e) hearing; there are few opportunities for a self-represented defendant to disrupt or

14

delay the administration of justice. The only burden that could be placed upon the administration of justice is what happened here: A defendant does not submit any arguments at the section 190.4(e) hearing. Although that may be unhelpful to the trial court's legal analysis, we have said that "failure to present mitigating evidence generally does not make a death judgment unreliable in a constitutional sense in the absence of misleading or erroneous instructions and argument." (*Bloom*, *supra*, 48 Cal.3d at p. 1228, fn. 9.) We thus conclude that section 190.4(e) hearings are not "trial proceedings" within the meaning of section 686.1.

Thus, even assuming Burgener had no constitutional right to represent himself, we conclude in light of *Bloom* that the trial court had discretion to consider Burgener's request and did not abuse its discretion in granting his request. Here, as in *Bloom*, "the defendant's stated intention to incur the death penalty does not in and of itself establish an abuse of discretion in the granting of the self-representation motion." (*Bloom*, *supra*, 48 Cal.3d at p. 1220.) Moreover, the trial court took adequate steps to ensure that Burgener's decision was informed, considered, and not impulsive, equivocal, or designed to frustrate the orderly administration of justice.

## II.

Burgener's remaining contention is that the trial court improperly refused to consider Judge Mortland's factual findings in the course of independently reviewing the record under section 190.4(e). As noted, Judge Mortland presided over the penalty retrial and, after the jury sentenced Burgener to death, modified the sentence to life imprisonment without parole in a section 190.4(e) ruling later reversed by the Court of Appeal. (*Burgener II*, *supra*, 223 Cal.App.3d at p. 430.) In his colloquy with Judge Riemer, Burgener suggested that Judge Mortland's decision to modify the sentence was informed by direct observation of the witnesses at the penalty retrial and that Judge Riemer, without the benefit of such observation, would not "be able to make the determination that Judge Mortland made."

15

The record reveals that Burgener has forfeited this claim. Before ruling on Burgener's motion to modify the verdict, Judge Riemer prepared a list of written questions for the Attorney General, including whether it was the Attorney General's position that the court was "bound in part" by the factual findings of the judge who presided over Burgener's original guilt and penalty trial, and whether the court's review of a "cold written record" in any way affected its duty to "independently evaluate the credibility of the witnesses." Citing *People v. Crew* (2003) 31 Cal.4th 822 (*Crew*), the Attorney General responded that Judge Riemer was not bound by the findings of any judge who had previously ruled on a motion to modify the verdict. And citing *People v. Lewis* (2004) 33 Cal.4th 214 (*Lewis*), the Attorney General further responded that Judge Riemer was required only to evaluate the credibility of witnesses as best he could from the written record. Judge Riemer offered Burgener the opportunity to address the Attorney General's responses, but Burgener declined. In denying the motion to modify the verdict, Judge Riemer said that he had no obligation to "consider the factual findings made by the judge who issued the prior ruling" and that "any attempt to do so would be inconsistent with this court's duty to conduct its own independent review of the evidence." Again, Burgener did not object. By not objecting at the hearing to the Attorney General's responses or to the trial court's reasons for its ruling, Burgener forfeited this claim. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1064.)

As to the merits, section 190.4(e) states that the judge hearing an application to modify the verdict "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." In *Crew*, the judge who presided over the defendant's trial, Judge Schatz, granted the defendant's motion to modify the verdict under section 190.4(e), but the ruling was reversed on appeal. On remand to redetermine the section 190.4(e) motion,

16

Judge Schatz was unavailable, so the matter was assigned to Judge Ahern, who denied the motion. The defendant "fault[ed] Judge Ahern's ruling for not taking into consideration Judge Schatz's previous findings in the prior ruling on the automatic motion to modify." (*Crew*, *supra*, 31 Cal.4th at p. 859.) But we found "no error," explaining that section 190.4(e) requires the judge "to review the evidence and to take into account and be guided by the statutory aggravating and mitigating evidence. Judge Ahern did so." (*Crew*, at p. 859.)

Similarly, in *Lewis*, the judge hearing a section 190.4(e) motion, Judge Charvat, was not the same judge who presided over the penalty trial. The defendant "sought to present the guilt and penalty phase evidence to Judge Charvat through live testimony on the ground that he had not personally observed the witnesses testify and therefore would be unable to evaluate their credibility in reweighing the evidence." (*Lewis*, *supra*, 33 Cal.4th at p. 224.) Judge Charvat declined to allow such testimony, and we found no error. (*Ibid.*) We explained that section 190.4(e) requires the judge to evaluate " 'the evidence presented' " and that "a re-presentation of evidence is not 'the evidence presented.' " (*Lewis*, at p. 224; see *id.* at p. 225 ["[A] modification application hearing 'is limited to review of the *evidence that was before the jury* . . . . [Citations.] Any attempt to recreate the evidence would conflict with this mandate."].) We rejected the contention that "in every case in which the original trial judge is replaced prior to a modification application, the defendant is in effect automatically entitled to a new trial because the replacement judge's ability to assess the credibility of witnesses is necessarily limited." (*Id.* at p. 225.) "[W]hen the original trial judge is unavailable, necessity requires the replacement judge to evaluate the credibility of the witnesses as best he or she can from the written record. We find no constitutional obligation to provide more." (*Id.* at p. 226.)

*Crew* and *Lewis* make clear that Judge Riemer had no obligation to consider the findings made by any judge who previously presided over this case. As required by

17

section 190.4(e), Judge Riemer reviewed the transcripts of the proceedings, reweighed the evidence presented to the jury, and stated on the record the reasons for his findings. However, Burgener's claim is not that Judge Riemer was *obligated* to consider Judge Mortland's findings. Instead, Burgener's claim is that "Judge Riemer was wrong in concluding that he *could not consider* Judge Mortland's findings because to do so would be inconsistent with the exercise of his independent judgment." (Italics added.) As the record shows, Judge Riemer apparently believed he was *prohibited* from doing so when he said that "any attempt to do so would be inconsistent with this court's duty to conduct its own independent review of the evidence."

Although our cases establish that a judge deciding a section 190.4(e) motion has no obligation to consider a prior judge's findings, we have not had occasion to consider whether a replacement judge is *required to ignore* such findings. The purpose of section 190.4(e) is to provide "an additional safeguard against arbitrary and capricious imposition of the death penalty in California." (*Lewis*, *supra*, 33 Cal.4th at p. 226.) Burgener argues that this purpose of ensuring accuracy and reliability in capital sentencing would be served, not undermined, by allowing a judge who must evaluate witness credibility in the course of "review[ing] the evidence" (§ 190.4(e)) to consider "the written findings of the trial judge who was ideally situated to make the ruling in the first instance." According to Burgener, allowing Judge Riemer the discretion to consider Judge Mortland's findings would not have been "incompatible or inconsistent with Judge Riemer's ultimate responsibility to conduct an independent review" because Judge Riemer was not obligated to consider those findings, the findings were not binding on Judge Riemer in any event, and "the last call was Judge Riemer's to make." "[N]o good reason appears to deprive him of the eyes and ears of Judge Mortland, who was present at the critical time of trial. To the contrary, to the extent that Judge Riemer was able to avail himself of those findings, the accuracy of his determination was likely to be enhanced. That check

18

on arbitrariness, after all, was the underlying purpose of the section 190.4, subdivision (e), proceeding itself."

We need not decide the merits of Burgener's claim because there is no reasonable possibility that Judge Riemer would have reached a different result even if he had believed he could consider Judge Mortland's findings. As an initial matter, it is uncertain whether Judge Riemer would have actually exercised his discretion to consider those findings or what weight he would have given them. Moreover, even if Judge Riemer had considered and credited Judge Mortland's findings, we see no reasonable possibility that Judge Riemer would have made a different ruling.

Burgener argues that Judge Mortland's findings as to the lack of credibility of prosecution witnesses Joseph DeYoung and Nola England would have aided "a theory of lingering doubt" as a mitigating factor. (See *Burgener III*, *supra*, 29 Cal.4th at pp. 848–851 [describing Burgener's lingering-doubt defense].) In essence, Burgener contends he was framed by DeYoung and England for Arias's murder. Although England was engaged to Burgener, she had also been romantically involved with DeYoung, who continued to pursue her after her engagement to Burgener. DeYoung admitted he was jealous of Burgener and initially called the police to report Burgener's crimes. DeYoung also facilitated Burgener's arrest by arranging an exchange of guns, whereby Burgener would trade a .22-caliber handgun (the apparent murder weapon) for another weapon supplied by DeYoung, and then informing the police of the time and place of the exchange. DeYoung, a convicted felon, received $10,000 from the owner of the convenience store where Arias was killed, and the district attorney reduced felony drug charges pending against DeYoung to a misdemeanor at the time of the preliminary hearing.

England initially denied any knowledge of the murder. But after the police threatened to charge her with perjury and take away her children, she admitted to the police that Burgener had told her he committed the robbery murder. She later regretted

19

inculpating Burgener and, in a letter to Burgener that she hoped the police would read, tried to make amends by claiming DeYoung was at fault. At Burgener's first trial, England claimed a lack of memory and implicated DeYoung. At the 1988 penalty retrial, however, England gave a detailed account of Burgener's admission. England also made a taped statement declaring Burgener's innocence, but the tape apparently disappeared.

Burgener asks us to take judicial notice of the record in *Burgener II*, where Judge Mortland said he was "not thrilled with the prosecution witnesses" because they " 'were persons who took drugs [and] committed various violations of the law.' " (*Burgener II*, *supra*, 223 Cal.App.3d at p. 432.) Although we grant Burgener's request (Evid. Code, § 452, subd. (d)), Judge Riemer independently determined that "Nola England was not a credible witness," so his consideration of Judge Mortland's similar assessment would not have added anything to his own analysis. As to DeYoung, Judge Riemer determined that "the weight of the evidence" did not support the contention that "Joseph DeYoung had the motive and opportunity to, and did in fact, frame the defendant for the crime." In Judge Mortland's view, DeYoung gave " 'crucial testimony to [Burgener's] conviction' " but lacked credibility. (*Burgener II*, at p. 432.) But the possibility that DeYoung had substantial motives (other than a desire to tell the truth) to pin blame on Burgener is apparent from the written record: he was jealous of Burgener's relationship with England, he was a convicted felon facing felony drug charges and wanted leniency, and he received significant payments from the convenience store owner. In addition, because the murder involved a gun that originally belonged to DeYoung, it is possible that DeYoung wanted to negate any inference of his own involvement in the crime. We have no reason to believe Judge Riemer did not consider these circumstances in his independent review of the evidence. Based on that independent review, Judge Riemer concluded that "the evidence of guilt, although circumstantial, is compelling. While there is a possibility that the defendant was framed, it is not a realistic possibility. The Court does not find that any doubt in the defendant's guilt is strong enough to mitigate

20

against a death penalty." We see no reasonable possibility that Judge Riemer would have reached a different conclusion if he had considered and credited Judge Mortland's doubt about DeYoung's credibility.

## CONCLUSION

For the reasons above, we affirm the judgment.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Burgener

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S179181
**Date Filed:** August 11, 2016

_____

**Court:** Superior
**County:** Riverside
**Judge:** Craig G. Riemer

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Harry Gruber and Elias Batchelder, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Robin Urbanski and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elias Batchelder
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

Meredith S. White
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2297