Filed 6/10/22  P. v. Manzano CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATHEW RUBEN MANZANO,<br><br>    Defendant and Appellant. | E075445<br><br>(Super.Ct.No. FSB18002623)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

Cliff Gardner and Daniel Buffington, under appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendant and appellant, Mathew Ruben Manzano, was prosecuted as an aider and abettor to the January 18, 2017, first-degree premeditated shooting and murder of Carmen R. in a parking lot outside of a café in San Bernardino. (Pen. Code, § 187, subd. (a);[1] count 1.) Defendant was not the shooter; at the time of the murder, he was in prison serving a sentence of life without parole (LWOP) for a 2005 murder.

Defendant was tried separately from other defendants for the murder. John Doe 2, an undisputed accomplice to the murder and an in-custody informant, testified that several incarcerated Mexican Mafia members or associates, including defendant, participated in a telephone conference call or "mesa call" with John Doe 2, in which John Doe 2 was ordered to see that Carmen R. was killed and that Isaac Aguirre would be the shooter.

John Doe 2 planned the shooting, including its location, and witnessed it from his vehicle. As planned, Aguirre shot and killed Carmen R. in the parking lot outside of the café as she was walking toward John Doe 2's car. Before the shooting, defendant sent electronic messages to Carmen R.'s phone, giving her directions to the café parking lot, describing John Doe 2's car, and indicating that her purpose in going there was to pick up money (taxes) from John Doe 2 on behalf of the Mexican Mafia.

In February 2020, a jury found defendant guilty as charged of Carmen R.'s murder and found two gang-related enhancement allegations true: a gang enhancement (former

---

[1] Unspecified statutory references are to the Penal Code.

§ 186.22, subd. (b); Stats. 2017, ch. 561, § 178 ), and a gang-related firearm enhancement (§ 12022.53, subds. (d), (e)(1)) [requiring showings that the defendant violated former § 186.22, subd. (b) and that a principal in the crime discharged a firearm causing great bodily injury or death]).

In a bifurcated trial, the court found a prior-murder special circumstance allegation true, mandating a life-without-parole (LWOP) sentence for the murder, regardless of the gang enhancement and gang-related firearm enhancement. (§ 190.2, subd. (a)(2).) The court also found defendant guilty of active gang participation (former § 186.22, subd. (a); count 2) and it found that defendant had two prior serious felony convictions (§ 667, subd. (a)) and a prior strike (§ 667, subds. (b)-(i)). The court made no finding on a gang-related special circumstance allegation (§ 190.2, subd. (a)(22)), which was bifurcated with the active gang participation charge.

In July 2020, defendant was sentenced to LWOP for the murder plus 25 years to life for the firearm enhancement (§12022.53, subds. (d), (e)(1)), plus 10 years (five years each) for the two "nickel" priors.[2] (§ 667, subd. (a)(1).)

In this appeal, defendant raises four claims of error. First, he claims the trial court erroneously denied his pretrial *Faretta*[3] motion to represent himself on the ground the

---

[2] In light of the 25-year-to-life enhancement on the gang-related firearm enhancement (§ 12022.52, subds. (d), (e)), the court imposed but stayed a 10-year term on the gang enhancement on count 1 (former § 186.22, subd. (b)(1)(C)) and imposed but stayed a 25-year-to-life term on the active gang participation conviction in count 2. (Former § 186.22, subd. (a)).

[3] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

motion was equivocal at the time it was made. We conclude that the motion was properly denied because it was equivocal and, even if it should have been granted, the record unequivocally shows that defendant abandoned his right of self-representation by failing to renew his motion within a reasonable time before trial.

Second, defendant claims the court prejudicially erred and violated his due process rights in instructing the jury on how it could evaluate John Doe 2's credibility. CALCRIM No. 337 told the jury it could not consider John Doe 2's physical constraints (shackles) while testifying and that his in-custody status did not, by itself, make him more or less believable. Defendant claims the instruction (1) prevented the jury from properly assessing John Doe 2's credibility, and (2) violated his due process rights by undercutting his defense that John Doe 2 was not a credible witness. We find no merit to these claims; the jury was properly instructed concerning its evaluation of John Doe 2's credibility.

Third, in light of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 633, §§ 3-5) (Assembly Bill 333), the parties and we agree that defendant's active gang participation conviction in count 2, and the jury's true findings on the gang enhancement and gang-related firearm enhancements on count 1, must each be reversed and the matter remanded for a new trial on count 2 and the enhancements on count 1. Assembly Bill 333 changed the substantive and procedural requirements for proving active gang participation charges, gang enhancement allegations, and, by extension, gang-related firearm enhancement allegations. (§§ 186.22, subds. (a), (b), 1109, 12022.53, subd. (e)(1).) The parties and we also agree that a court or jury is not

4

precluded from making a finding on the gang-related special circumstance allegation on count 1 (§ 190.2, subd. (a)(22)) in a subsequent retrial on that issue.

Fourth and lastly, defendant claims that several fines and assessments imposed at his July 10, 2020 sentencing must be stricken.[4] With the exception of $70 in per-conviction fees on count 1, we reverse the fines and assessments along with defendant's active gang participation conviction in count 2 and the two gang-related enhancements on count 1. We affirm the judgment in all other respects, including defendant's murder conviction and LWOP sentence on count 1. We remand the matter for further proceedings on count 2 and the three gang-related enhancements on count 1.

## II.  FACTUAL BACKGROUND

A. *Prosecution Evidence*

1. Carmen R. and the Mexican Mafia

When Carmen R. was murdered on January 18, 2017, her husband, "Huero," was an inmate at Pelican Bay State prison. Huero was a member of the Westside Verdugo, a San Bernardino Hispanic criminal street gang, and he was also a member of the Mexican Mafia, a powerful prison gang that controls all Southern California-based Hispanic gangs known as "Sureños" gangs. The Mexican Mafia is comprised of high-ranking Sureños gang members, and most Mexican Mafia members are incarcerated.

---

[4] The court imposed a total of $140 in per-conviction court operations and court facilities assessments on counts 1 (murder) and 2 (active gang participation), or $70 on each conviction, and a $2,000 restitution fine, even though the court found that defendant was unable to pay the costs of his appointed counsel and the presentence investigation report. The court also imposed a $2,000 parole revocation fine, even though defendant's sentence did not include a parole period.

The Mexican Mafia controls the operations of Sureños gangs, both in custodial settings and on the streets, in exchange for protecting Sureños gang members from Hispanic gangs in custodial settings. Although a Sureños gang member may work for a particular Mexican Mafia member, all Sureños gang members owe their allegiance to the Mexican Mafia "organization" rather than to any particular Mexican Mafia member, including one from the Sureños gang member's local gang.

The Mexican Mafia collects money or "taxes" from Sureños gangs, representing portions of the monies that the gangs receive from the sales of drugs, guns, and other contraband. Sureños gangs pay their taxes to Mexican Mafia members through "secretaries" and other intermediaries. Huero collected taxes from Sureños gangs operating in parts of Riverside and San Bernardino Counties, including Westside Verdugo, his local gang. Carmen R. was a secretary for Huero and, by extension, for the Mexican Mafia; she collected taxes from the Sureños gangs under Huero's control.

In late 2016, the Mexican Mafia placed Huero on "disregard," meaning he was not in good standing with the Mexican Mafia and that Sureños gangs had to disregard his orders. According to John Doe 2, Carmen R. was suspected of keeping some of the taxes she was supposed to be paying either to Huero or to other Mexican Mafia members. Other evidence showed that, at the time of Carmen R.'s murder, there was a power struggle within the Mexican Mafia for control over the areas and the taxes that Huero controlled.

To carry out their orders on the streets, incarcerated Mexican Mafia members may use "secretar[ies]" who may act as messengers, "keyholder[s]" or trusted gang members

6

in charge of a local gang's operations, and telephone conference calls known as "mesa" ("table") calls. In a mesa call, Mexican Mafia members or their associates may give orders directly to the persons who are to carry out the orders.

A mesa call typically includes several Mexican Mafia members or their associates, and may include secretaries and keyholders. A mesa call begins with a roll call in which each mesa participant announces himself. Typically, only gang members who will be involved in carrying out the orders made in the mesa call will be included in that mesa call.

### 2. Gang Members Involved in Carmen R.'s Murder

John Doe 2 was a Mexican Mafia associate, a lifelong founding member of the Sur Crazy Ones clique, one of several cliques or subsets of the Westside Verdugo, as well as a keyholder for Huero, and, by extension, for the Mexican Mafia's control of the Sureños gangs that reported to Huero. John Doe 2 would carry out Mexican Mafia orders given to him through a secretary or a mesa call. Following his release from prison in July 2016, John Doe 2 began collecting taxes from the Sureño gangs under Huero's control and giving the money to Carmen R., who was supposed to be giving the money either to Huero or to other Mexican Mafia members or associates.

Like John Doe 2, Eric Moreno ("Green Eyes"), Richard Garcia ("Easy"), and Aguirre ("Crook") were members of the Sur Crazy Ones clique of the Westside Verdugo. Moreno and Garcia were also Mexican Mafia members or associates, and Moreno had also worked as a secretary or messenger for Huero. Aguirre was in trouble with the Mexican Mafia and had to perform tasks in order to return to good standing.

7

Defendant, known as "Nips" and "Chino" or "Chinito," was a Mexican Mafia associate from the Varrio Redlands gang, another Sureños gang, which, like the Westside Verdugo and its cliques, worked under and owed allegiance to the Mexican Mafia organization. Defendant had worked as a secretary for the Mexican Mafia and had also done work for Huero. The Varrio Redlands and Westside Verdugo gangs sometimes collaborated in carrying out Mexican Mafia-related business.

3. John Doe 2's Testimony, the Mesa Call, and Carmen R.'s Murder

John Doe 2 testified for the prosecution, physically restrained with shackles visible to the jury, and wearing a green jumpsuit showing that he was in protective custody. John Doe 2 was on the Mexican Mafia's "hard candy" list, meaning he was in "big trouble" and could be physically assaulted or killed. John Doe 2 testified that, one day in January 2017, Moreno contacted him and told him he needed to join a mesa call later that day. Moreno was the "head of the table" or mesa. John Doe 2 was "taking orders" from Moreno but knew that Moreno was "doing things" for other Mexican Mafia members.

John Doe 2 joined the mesa call around 5:20 p.m., 20 minutes after it began, using his cousin's "boyfriend's phone" because he was having trouble charging his own phone. The other participants in the mesa call, namely, Moreno, Garcia, "Nips,"[5] and "Joker,"[6]

---

[5] John Doe 2 did not identify defendant as Nips and testified that he did not know Nips's legal name. He had spoken with Nips only once before the January 2017 mesa call, and he had never met Nips in person; but he believed that Nips was from Redlands.

[6] Joker was not identified at trial. John Doe 2 knew that Joker was from the Westside Verdugo, but he had never met Joker in person and only knew Joker's last name.

each announced their presence. With the exception of John Doe 2, who was out of custody, all of the participants in the mesa call were in state prison.

Moreno led the mesa call and summarized what was to be done: Carmen R. was to be murdered that night; Aguirre was to be the shooter, and John Doe 2 was to see that the murder was carried out. After the mesa call, John Doe 2 drove to Aguirre's home in San Bernardino and told Aguirre how the murder was to be done: Carmen R. would be lured to a café near Aguirre's home; John Doe 2 and Aguirre would drive to and from the café in separate cars; Aguirre would wait in a field near the café until Carmen R. got out of her car and walked toward John Doe 2's car; then Aguirre would approach, shoot and kill her. By staying in his car, John Doe 2 was planning to "force" Carmen R. to get out of her car and walk toward John Doe 2's car so that Aguirre could shoot her as she was walking in the parking lot.

John Doe 2 purchased a .38-caliber revolver, which does not expend shell casings when fired, and gave it to Aguirre to use in the shooting. John Doe 2 also obtained a rental car for Aguirre, had its license plates covered with paper dealer plates to evade detection, and told Aguirre to park the rental car around the corner from the café, near a field, and to approach the café and shopping center parking lot through the field.

At some point, either during or after the mesa call, John Doe 2 told the mesa call participants to have someone "lure" or direct Carmen R. to the café because John Doe 2's phone would not stay charged and he could not communicate with Carmen R. by phone. Aguirre was in contact with Moreno after the mesa call and told John Doe 2 that "Nips"

9

would lure Carmen R. to the café, using a ruse that she would be picking up taxes from John Doe 2 for delivery to the Mexican Mafia.

Around 9:30 p.m. on January 18, 2017, Carmen R. arrived in the parking lot outside of the café and parked in front of the café. Her 14-year-old daughter was in her passenger seat, and John Doe 2 was parked nearby. Carmen R.'s daughter waved at John Doe 2 to get him to walk over to them, but John Doe 2 ignored her and stayed in his car. Carmen R. got out of her car and walked toward John Doe 2's car; when she was close to the front of John Doe 2's car, Aguirre shot her 4 to 5 times from behind John Doe 2's car. Carmen R. collapsed on the ground and died a short time later of gunshot wounds to her chest and abdomen. Carmen R.'s daughter identified Aguirre in a photographic lineup as the shooter. Bullet fragments, but no shell casings, were found at the scene.

After the shooting, Aguirre returned to his home near the café. John Doe 2 went to a home in Riverside County, recharged his cell phone, called Moreno, and told him that Carmen R.'s murder had been successfully carried out. Huero was murdered in April 2017.

Moreno was murdered on or about July 15, 2018, several days after murder charges were filed in this case against Moreno, defendant, and others. After Carmen R. was murdered, Moreno controlled the Westside Verdugo and the other gangs that Huero had previously controlled for the Mexican Mafia. After Moreno was murdered, Garcia controlled the same gangs for the Mexican Mafia.

4. <u>Evidence Identifying Defendant as Nips and of Nips's Role in the Shooting</u>

On Carmen R.'s phone, officers found several electronic messages from a contact she saved as "Nips" and a phone number ending in "4771," which were sent to Carmen R.'s phone shortly before the shooting. The messages gave Carmen R. directions to the café, described John Doe 2's car, and indicated that the purpose of the trip was to collect taxes from John Doe 2 for the Mexican Mafia. Carmen R. also sent electronic messages to Nips, describing her location and where she was parked in relation to the café. Around the same time, "Nips," or the phone number ending in "4771," was communicating with phone numbers associated with Moreno and Garcia.

Shortly before the murder, the "4771" phone number pinged at cell phone towers near Kern Valley State Prison where defendant was incarcerated. In an interview, defendant admitted that the "4771" phone number was his and, in a recorded jail call, defendant admitted to his grandmother that he sent electronic messages to Carmen R. before she was murdered.

The subscriber for the "4771" phone number was listed as "Ruben M.," at defendant's former address in Redlands with the e-mail address, "mattypooh23@gmail.com." Internet browsing records linked to this e-mail address showed that, within hours of the shooting and before a news release of the shooting had been issued, the user searched a San Bernardino newspaper for reports of the shooting.

The "4771" phone number was also linked to the user name Ruben Manzano on a social media platform, and a social media page under the same user name contained numerous photographs of defendant and messages referring to the user as "Nips." The

social media account for the user Ruben Manzano also listed defendant's mailing address and his California Department of Corrections and Rehabilitation (CDCR) inmate number. In a social media post, the same Ruben Manzano stated that he used the name Ruben to be "low key," but his true name was Mathew.

  5. <u>John Doe 2's Cooperation Agreement</u>

  Investigators interviewed John Doe 2 in July 2017, following his arrest for an unrelated offense and parole violation. John Doe 2 initially denied knowing anything about the murder but admitted his involvement after investigators allowed him to listen to wiretapped recordings of his phone conversations with Moreno and other gang members. John Doe 2 later entered into a cooperation agreement with the prosecution: he agreed to serve 25 years to resolve all of his pending criminal charges, including a charge for the murder of Carmen R., if he testified truthfully for the prosecution in this case. Without the cooperation agreement, John Doe 2 faced two life sentences: one for Carmen R.'s murder and another for unrelated charges.

B. *Defense Case*

  Defendant did not testify or present any affirmative evidence. Nor did the defense dispute that Carmen R. was murdered. Rather, the defense claimed that John Doe 2 was not a credible witness; defendant did not participate in the mesa call, if any, in which the murder was directed; nor did defendant "lure" or direct Carmen R. to the café where she was murdered. The defense claimed that someone other than defendant must have used defendant's "4771" phone number for the mesa call and to send the electronic messages directing Carmen R. to the scene of her murder.

12

### III.  DISCUSSION

A.  *Defendant's* Faretta *Motion Was Properly Denied and Was Ultimately Abandoned*

Defendant claims the court violated his constitutional rights to self-representation in denying his May 9, 2019 *Faretta* motion to represent himself at trial.  We conclude the motion was properly denied on the ground it was equivocal.  Even if the motion should have been granted, defendant abandoned his right to self-representation by failing to renew his *Faretta* motion within a reasonable time before trial.

#### 1.  Relevant Background

In July 2018, the prosecution filed a felony complaint charging defendant, Garcia, Aguirre, Moreno, and Robert Fernandez, Jr., with Carmen R.'s murder.  On August 15, defendant pled not guilty to the murder charge and denied the enhancement allegations.  On August 23, the public defender declared a conflict of interest in defendant's case, and attorney Scott Brown was appointed to represent defendant.  On the scheduled date for the preliminary hearing, September 10, the attorneys for Fernandez and Moreno were not available to proceed, and Aguirre objected to proceeding due to his medical condition because he had had surgery that morning.  Defendant and Garcia were willing to waive their rights to a preliminary hearing.  The preliminary hearing was trailed to September 11 and was held over the course of six days:  September 11, 21, and 24, October 12, and November 9 and 16.

On December 12, 2018, the People filed a first amended information, adding two special circumstance allegations to the murder charges against defendant, Garcia, and

13

Aguirre.[7]  The special circumstance allegations made defendant eligible for an LWOP sentence for the murder, so the court relieved attorney Brown and said it would "get the name of another attorney from the LWOP list to take over" defendant's case.

On the next court date, January 4, 2019, attorney Dan Mangan from the LWOP list substituted into the case for defendant.  On January 18, Mangan asked the court to continue the trial from January 22 to April 5 to give Mangan more time to prepare and to ensure defendant's right to effective assistance of counsel.  Defendant was refusing to waive time so his trial had to begin by January 25, unless the court found good cause to continue it.  Over defendant's objection, the court found good cause for Mangan's requested continuance and set a pretrial conference on April 5.

On April 5, 2019, counsel for Aguirre, who like Mangan had been appointed in January 2019, asked the court to continue the trial for 120 days, to August 2019, but noted that defendant and Garcia were still not willing to waive time for trial.  Counsel for Garcia specially appeared for Mangan and said that Garcia and defendant had been "clear and consistent that they were not going to waive any time," and had even "tried to waive the prelim to get a trial date sooner."  Counsel said he and Mangan were ready for trial and that severing Garcia's and defendant's cases from Aguirre's case appeared to be appropriate.  The court continued the trial to May 13 for all of the defendants and set a May 9 trial readiness conference.  Garcia and defendant were ordered to file severance motions by April 19 if they wanted their cases to be severed.

---

**7**  By this time, Moreno was dead, and neither Moreno nor Fernandez were named in the first amended information.

14

On May 9, 2019, the court severed Garcia's case and assigned it for trial.  Mangan said he expected to be engaged in another trial until May 23, so May 24 was the earliest day he could be ready for defendant's trial.  For Aguirre's and defendant's cases, the court scheduled a trial readiness conference on May 31 and a June 3 trial date.  The prosecutor then told the court that defendant had indicated he wanted to "go pro per."  The court asked defendant whether that was correct, and defendant said, "Yes, I'm ready to announce ready for trial.  If we want, we can come back and take care of that on the 24th . . . if my lawyer [Mangan] is not ready."

The court explained to defendant that Mangan was in trial and would be ready to begin defendant's trial after he completed his current trial.  The court continued:  "You have the right to request to represent yourself. . . .  [M]y understanding at bench conference [is that] you were going to request to represent yourself and go ahead and be tried along with Mr. Garcia.  Is that your intent?"  Defendant responded, "My intent is to get a trial by myself, so. . . ."  The court then said, "So you're saying you would not be ready to go to trial with Mr. Garcia starting probably Monday of next week if you were representing yourself?"  Defendant responded, "I'm ready, your Honor.  If we go next week, I'm ready.  If we come back on the 24th and my lawyer says he's not ready, I'm ready."  Mangan then said, "I won't schedule another trial.  He'll be next up."

At this point, the court said it would return to defendant's case in a moment and briefly handled two other matters.  Returning to defendant's case, the court said, "Based on the record for Mr. Manzano, I find that his request to represent himself is at the moment equivocal.  He, I think, [p]refers that Mr. Mangan represent him.  That looks like

15

it's going to be able to occur soon.  So the *Faretta* motion is denied today without prejudice.  That case will be recalled on May 31 . . . for assignment calendar."

Aguirre's and defendant's cases were later continued to June 17, 2019.  On June 17, the court found good cause to continue the cases to September 13, both because Aguirre's counsel would not be ready for trial until September 13 and because no courtrooms were available on June 17, even though Mangan was ready for trial.  On September 13, Mangan again announced ready for trial, but the court found good cause to continue Aguirre's and defendant's cases to November 22, based on Aguirre's medical condition.  Defendant objected to the continuance on the grounds he had not waived time and had a right to a speedy trial.

On November 22, 2019, the court severed Aguirre's and defendant's cases and continued defendant's case to November 26 so it could find an available courtroom for defendant.  Mangan moved to dismiss defendant's case on the ground the case had been continued for good cause *only* through November 25 and could not be trailed for 10 days beyond November 25.  The court disagreed and denied the dismissal motion.  On November 26, defendant's case was assigned for trial on December 4.  On December 4, Mangan renewed his dismissal motion, but the court again denied it, finding defendant's constitutional and statutory rights to a speedy trial had not been denied.  Defendant never renewed his *Faretta* motion after the court denied it without prejudice on May 9.  Defendant's trial began on December 4, and Mangan represented defendant throughout his trial and sentencing.

16

2. <u>Applicable Law</u>

A criminal defendant has a constitutionally mandated right of self-representation. (*Faretta*, *supra*, 422 U.S. at p. 817.) "The right of self-representation is absolute, but only if a request to do so is knowingly and voluntarily made and if asserted a reasonable time before trial begins. Otherwise, requests for self-representation are addressed to the trial court's sound discretion. [Citation.] Moreover, whether timely or untimely, a request for self-representation must be unequivocal." (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) The requirement that a *Faretta* motion be unequivocal helps to ensure that the motion is knowingly and voluntarily made, that the defendant "truly desires" to represent himself, and that the defendant's constitutional right to effective assistance of counsel, which secures the protection of many of the defendant's other constitutional rights, will not be abridged. (*People v. Marshall* (1997) 15 Cal.4th 1, 23.)

The erroneous denial of a *Faretta* motion is reversible per se. (*People v. Best* (2020) 49 Cal.App.5th 747, 756.) On appeal, we independently examine the entire record to determine whether the defendant *unequivocally*, or knowingly and voluntarily, invoked his right of self-representation. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 453; *People v. Stanley* (2006) 39 Cal.4th 913, 932-933.) A defendant's request for self-representation is equivocal if the defendant's " 'statements or actions create *any ambiguity as to his desire to represent himself.*' " (*People v. Marshall*, *supra*, 15 Cal.4th at p. 23.) Courts "draw every inference against supposing that the defendant wishes to waive his right to counsel." (*Ibid.*) Thus, a motion made "out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-

17

representation." (*Id.* at p. 21.) In "some circumstances, remarks facially resembling requests for self-representation [are] equivocal, insincere, or the transitory product of emotion." (*People v. Tena* (2007) 156 Cal.App.4th 598, 607.)

3. Analysis

Defendant claims his *Faretta* motion was erroneously denied as equivocal because his request for self-representation was plainly *unequivocal*. We disagree. Although when defendant made the motion he told the court that he was "ready" to go to trial, even if his trial began the following week and regardless of whether his case was severed from Garcia's and Aguirre's cases, the court was required to consider *all* of defendant's words and conduct in determining whether his request for self-representation was unequivocal (*People v. Doolin*, *supra*, 45 Cal.4th at p. 453) and whether he "truly desired" to represent himself (*People v. Marshall*, *supra*, 15 Cal.4th at p. 23).

Some of the words defendant used in making his *Faretta* motion show that the motion was equivocal, and indicated that he did not truly wish to represent himself, as he said, regardless of whether his counsel would be ready on May 24. In making the motion, defendant said, "If we want, we can come back and take care of [my *Faretta* motion] on the 24th . . . *if my lawyer is not ready*." (Italics added.) He later said, "If we come back on the 24th *and my lawyer says he's not ready*, I'm ready." (Italics added.) These words show that defendant truly wanted to *wait until May 24*, when he would know whether his appointed counsel, Mangan, would be available for his trial, to decide whether he wanted to represent himself. Defendant did not express the unequivocal desire for immediate self-representation but rather made the request with a wait-and-see

approach as to whether his lawyer would be available and ready for trial at the next appearance. Thus, defendant's motion was equivocal, as the court said, at the time it was made.

Defendant's conduct also shows his *Faretta* motion was equivocal. Throughout the pretrial proceedings, defendant refused to waive his speedy trial rights; he objected to every continuance request made at the behest of the other defendants or their counsel; and he told the court he wanted his case to be tried separately. In this context, he ostensibly saw his *Faretta* motion as a means of advancing his case to trial as quickly as possible. But again, his words indicated that he wanted to wait until May 24, when he would know whether Mangan would be available to try his case beginning on May 24, to decide whether he truly wanted to represent himself.

Defendant stresses that he never said, and the court never asked him, whether he preferred to be represented by Mangan. But there was no need for the court to ask defendant whether he preferred to be represented by Mangan because defendant's words showed he wanted Mangan to continue representing him, if Mangan would be available to begin his trial on May 24. In asking the court to defer ruling on his motion until May 24, and in saying that he would be ready for trial on May 24 *if* Mangan was not ready, he effectively conditioned his motion on Mangan being unavailable for trial on May 24. This made his motion conditional and therefore equivocal.

Defendant argues that his frustration with the progress of his case, as of May 9, 2019, does not mean that his *Faretta* motion was equivocal. He relies on *People v. Burgener* (2016) 1 Cal.5th 461 (*Burgener*) where the defendant claimed his *Faretta*

19

motion to represent himself on a motion to modify his death penalty sentence to LWOP (§ 190.4, subd. (e)) was erroneously *granted* because his *Faretta* motion was equivocal (*Burgener*, at pp. 465, 471).  The *Burgener* court concluded that the *Faretta* motion was unequivocal, reasoning that the defendant's expressions of frustration with the slow progress of his case, and his stated desire to " 'get [his] case . . . through the courts' " before he " 'die[d] of old age,' " did not, under the circumstances, show that his *Faretta* motion was equivocal.  (*Id*. at p. 471.)

*Burgener* is distinguishable.  Unlike defendant, the defendant in *Burgener* did not indicate to the court that he wanted the court to defer ruling on his motion, nor did the defendant appear to condition his request for self-representation on anything occurring in the future, including his attorney being unavailable to represent him at a specified time.  Rather, the defendant in *Burgener* was "resolute" in invoking his right to represent himself on his motion to modify his death penalty verdict.  (*Burgener*, *supra*, 1 Cal.5th at pp. 464-471.)  The defendant's case had been pending for many years, and two earlier orders denying the defendant's motion to modify his death penalty verdict had been overturned on appeal.  (*Id.* at pp. 464-465, 471.)  The defendant had also made two prior requests to represent himself on the modification motion.  (*Id.* at p. 471.)  And when the defendant made his current *Faretta* motion, the court, prosecutor, and defense counsel "all agreed, based on their direct observations," that the defendant made a "careful and informed judgment" in moving to represent himself.  (*Id.* at pp. 464-465, 471.)

Thus, the *Burgener* defendant's expressed frustration with the slow progress of his case did not, under all of the circumstances that obtained in that case, make his *Faretta*

20

request equivocal.  (*Burgener*, *supra*, 1 Cal.5th at p. 471.)  But here, the entire record, including defendant's words and actions, and the circumstances in which his motion was made, show he did not truly wish to represent himself when he made his *Faretta* motion on May 9, 2019.  His frustration with the ongoing continuances of his trial was the ostensible, motivating factor for his *Faretta* motion.  Had he truly wished to represent himself, he would not have told the court that it could defer ruling on his *Faretta* motion until May 24, when he would know whether Mangan would be available to begin his trial.  (*People v. Danks* (2004) 32 Cal.4th 269, 296 [The "defendant's references to self-representation were equivocal, born primarily of frustration regarding the granting of counsel's requests for continuances and [the defendant's] desire to avoid further psychiatric examination."].)

Lastly, and as the People point out, defendant abandoned his *Faretta* motion by failing to renew it within a reasonable time before his trial began on December 4, 2019 and by accepting Mangan as his trial counsel.  "The *Faretta* right, once asserted, may be waived or abandoned," even if the *Faretta* motion was erroneously denied when it was made.  (*People v. Dunkle* (2005) 36 Cal.4th 861, 909-910 [*Faretta* motion waived or abandoned by the defendant's conduct after motion was erroneously denied]; *People v. Stanley*, *supra*, 39 Cal.4th at p. 933 [*Faretta* motion abandoned by the defendant's subsequent acceptance of several appointed counsel to represent him during trial].)  That defendant did not renew his *Faretta* motion after May 9, and that Mangan continued to represent him throughout his trial and sentencing, also shows that he did not truly wish to represent himself when he made the motion on May 9.

21

B. *The Jury Was Properly Instructed Concerning John Doe 2's Credibility*

Defendant next claims the court prejudicially erred in instructing the jury pursuant to CALCRIM No. 337 [Witness in Custody or Physically Restrained] that it could not consider John Doe 2's physical constraints and in-custody status, in and of themselves, in evaluating the credibility of his testimony. Defendant argues these two factors were "directly relevant" to John Doe 2's credibility and, by instructing the jury not to consider them, the court prevented the jury from properly assessing John Doe 2's credibility based on all relevant factors, under the circumstances of this case. Defendant claims the error deprived him of his constitutional right "to have the jury determine every material issue presented by the evidence" (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351) along with a " 'meaningful opportunity to present a complete defense' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690), and that the error was prejudicial under the *Chapman*[8] standard. We find no error.[9]

---

[8] *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

[9] The People argue defendant has forfeited this claim of instructional and constitutional error by failing to object to CALCRIM No. 337 in the trial court or by asking the court to modify the instruction with "appropriate clarifying or amplifying language." The People do not explain what modifying language defendant should have requested. Defendant acknowledges he did not object to or ask the court to modify CALRCIM No. 337, but he argues we should consider his claim because the alleged error in giving CALCRIM No. 337 affected his substantial rights. (§ 1259.) We consider the merits of the claim because this is necessary to ascertain whether there was any error and, if so, whether the error affected defendant's substantial rights. (*People v. Mason* (2013) 218 Cal.App.4th 818, 824.) As we explain, we find no error.

22

1. The Instructions on Witness Credibility

CALCRIM No. 337 addressed the testimony of John Doe 2 and another witness, John Doe 1.[10] It stated: "When John Doe 1 and John Doe 2 testified, they were physically restrained. Do not speculate about the reason. You must completely disregard the circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations. Evaluate the witness's testimony according to the instructions I have given you. [¶] When John Doe 1 and John Doe 2 testified, they were in custody. [Do not speculate about the reason.] The fact that a witness is in custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions I have given you."

The court also gave CALCRIM No. 226, which told the jury that it was to "judge the credibility or believability of the witnesses," and, in evaluating a witness's testimony, it could "consider anything that reasonably tends to prove or disprove the truth or accuracy of" the testimony. This instruction then listed several nonexclusive factors that the jury could consider in assessing witness credibility, which included whether the witness's testimony was influenced by "a factor such as bias or prejudice" or "a personal interest in how the case is decided," and whether the witness was "promised immunity or leniency in exchange for his or her testimony."

The jury was also instructed that it could consider the fact a witness had committed a crime in evaluating the credibility of the witness's testimony (CALCRIM

---

[10] Defendant does not challenge CALCRIM No. 337 as it applied to John Doe 1.

23

No. 316); if the crime of murder was committed, John Doe 2 was an accomplice to the murder; defendant could not be convicted of murder based on John Doe 2's testimony alone; and accomplice testimony could be used only if it was supported by other evidence that the jury believed, which was independent of the accomplice's testimony, and which tended to connect the defendant to the commission of the crime. (CALCRIM No. 335.) The jury was also instructed to "[v]iew the testimony of an in-custody informant against the defendant with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or the expectation of, any benefits . . . ." (CALCRIM No. 336.)

  2. <u>Applicable Law and Analysis</u>

  We review claims of instructional error de novo. That is, we determine whether the instruction correctly stated the law and whether there is a reasonable likelihood that it caused the jury to misapply the law in violation of the Constitution. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood that the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) We also " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

  Trial courts have a *sua sponte* duty to give CALCRIM No. 337 "if the witness has been physically restrained in a manner that is visible to the jury." (Judicial Council of

24

Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 337, p. 111; *People v. Duran* (1976) 16 Cal.3d 282, 291-292 (*Duran*). The instruction applies to all physically restrained or in-custody witnesses, including accomplices who testify for the prosecution. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 114 (*Mackey*) [noting that although the ruled articulated in *Duran* only concern physical restraints on defendants and defense witnesses (*Duran*, at p. 288, fn. 4), the Bench Notes to CALCRIM No. 337, "seem to require the same treatment of a shackled prosecution witness," and finding no authority not to give CALCRIM No. 337 for a prosecution accomplice witness].)

Defendant argues, however, that giving CALCRIM No. 337 was unconstitutional "[g]iven the circumstances of this case." He claims John Doe 2's physical restraints and in-custody status were "directly relevant to assessing his desire to testify favorably for the state," thus, "the jury should not have been foreclosed from considering" these facts in evaluating his credibility. We disagree.

Many factors were relevant to evaluating John Doe 2's credibility, but his physical restraints and his in-custody status while testifying were not among them. CALCRIM No. 337 properly conveyed this to the jury. The relevant credibility factors, that is, the reasons underlying his custodial status, were made known to the jury. Further, all of the instructions concerning witness credibility (CALCRIM Nos. 226, 316, 335, 336 & 337) allowed the jury to completely evaluate John Doe 2's credibility based on all relevant factors. These included: (1) John Doe 2's status as an accomplice to Carmen R.'s murder, if the jury found there was a murder (CALCRIM No. 335); and (2) John Doe 2's status as an in-custody informant against defendant, who had been promised a 25-year

25

sentence in lieu of two potential life sentences for testifying for the prosecution (CALCRIM No. 336).

As noted, and given John Doe 2's status as an accomplice and in-custody informant testifying against defendant, the jury was instructed that it could not convict defendant of Carmen R.'s murder based on John Doe 2's testimony alone, and that it had to view his testimony "with caution and close scrutiny."  (CALCRIM Nos. 335 & 336.) The jury was also instructed to consider other relevant and overlapping factors in evaluating John Doe 2's credibility, including his criminal history (CALCRIM N0. 316), his bias or prejudice, his personal interest in how the case was decided, whether he was "promised immunity or leniency in exchange for his or her testimony," and "anything that reasonably tend[ed] to prove or disprove the truth or accuracy" of his testimony (CALCRIM No. 226).

In sum, all of the instructions on witness credibility allowed the jury to consider anything that may have been relevant to John Doe 2's credibility, including any motive he may have to "shade" his testimony "favorably" to the state, as defendant argues. Thus, we discern no reasonable likelihood that the jury applied CALCRIM No. 337 in an impermissible or unconstitutional manner.  (*People v. Houston*, *supra*, 54 Cal.4th at p. 1229.)  That is, CALCRIM No. 337 did not deprive defendant of his constitutional right to present a complete defense or to have the jury determine every material issue presented by the evidence.  CALCRIM No. 337 did not prevent the jury from considering *any factors* relevant to John Doe 2's credibility.

26

Defendant does not explain why John Doe 2's physical restraints and in-custody status were, alone or in and of themselves, "directly relevant" to evaluating John Doe 2's credibility under the circumstances of this case, or why all of the instructions on witness credibility did not allow the jury to "completely" assess John Doe 2's credibility. Instead, he stresses that John Doe 2 was a crucial prosecution witness because he was the only witness who testified that "Nips" participated in the mesa call in which Carmen R.'s murder was ordered. Thus, he argues, John Doe 2's credibility was "critical" to the prosecution's case. But even though John Doe 2's testimony was critical to the prosecution's case, and the defense vehemently disputed his credibility, CALCRIM No. 337 did not, as defendant argues, "undercut" defendant's claim that John Doe 2 was not a credible witness, and thus violate defendant's constitutional right to present a complete defense.

A substantially identical argument was rejected in *Mackey*. (*Mackey*, *supra*, 233 Cal.App.4th at p. 115.) The defendants there argued that CALCRIM No. 337 "undercut" their claim that a shackled, in-custody prosecution's witness was not credible. (*Ibid.*) In rejecting the argument, *Mackey* observed that CALCRIM No. 337 "did not tell the jury *not* to consider the reasons *underlying*" the prosecution witness's in-custody status, and noted that defendants were "confus[ing] the credibility inferences properly drawn" from the witness's "criminal conduct and conflicting stories with those that are not allowable on the basis of shackling or in-custody status *alone*." (*Ibid.*)

Similarly here, defendant is confusing the credibility inferences properly drawn from defendant's status as an accomplice to Carmen R.'s murder (CALCRIM No. 335)

27

and as in-custody informant testifying against defendant (CALCRIM No. 336), with the facts he was physically restrained and in-custody while testifying. His status as an accomplice and an in-custody informant against defendant *was* directly relevant to his credibility, and the jury was properly instructed on how to evaluate those factors. But those factors are not to be confused with his shackles and in-custody status while testifying, which were not, in and of themselves, relevant to his credibility, much less "directly relevant" to his credibility. (*Mackey*, *supra*, 233 Cal.App.4th at p. 115.)

C. *Defendant's Gang Participation Conviction (§ 186.22, subd. (a)) and Gang-related Enhancements (§ 186.22, subds. (b)(1)(C), 12022.53, subd. (e)(1)) Must be Vacated*

Defendant claims his active gang participation conviction in count 2 (§ 186.22, subd. (a)), and the two gang-related enhancements on his murder conviction in count 1 (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (d), (e)(1)) must be vacated in light of Assembly Bill 333 (2021-2022 Reg. Sess.), the "STEP Forward Act of 2021." (Stats 2021, ch. 699, § 3-5, eff. Jan 1, 2022.) The People agree, and so do we.

Thus, we vacate defendant's active gang participation conviction in count 2 and the gang enhancement and gang-related firearm enhancement on his murder conviction in count 1. We remand the matter to the superior court so the People may elect whether or not they wish to retry the vacated charge and enhancement allegations, along with the gang-related special circumstance allegation that the court did not make a finding on, all in accordance with the law as it has been amended by Assembly Bill 333.

1. Retroactivity

Assembly Bill 333 amended section 186.22 and added section 1109 to the Penal Code, effective January 1, 2022. (Stats. 2021, ch. 699, §§ 3-5.) The parties agree, and so do we, that Assembly Bill 333's ameliorative changes to section 186.22 apply retroactively to judgments not final on appeal as of the bill's January 1, 2022 effective date. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343-344 [substantive changes in Assembly Bill 333 apply retroactively because they "increase[] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement[;]"]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 [same].) Because defendant's July 10, 2020 judgment of conviction and sentence is not final on appeal (*People v. Vieira* (2005) 35 Cal.4th 264, 306), the amendments to section 186.22 retroactively apply to the judgment.

The parties also agree, and so do we, that the amendments to section 186.22, subdivision (e), together with newly enacted subdivision (g), which changed the criteria for establishing a predicate offenses and, by extension, the existence of a pattern of criminal gang activity and a criminal street gang (§ 186.22, subds. (e)-(g); Assembly Bill 333, § 5), require us to vacate defendant's active gang participation conviction in count 2 and the gang-related enhancements on count 1. It is therefore unnecessary to decide whether the conviction and enhancements must be vacated on any other ground.[11]

---

[11] For example, it is unnecessary to decide whether newly enacted section 1109 (Assembly Bill 333, § 5), which, at the defendant's request, requires the court to allow charges to be tried before and separately from gang-related allegations on the charges,

*[footnote continued on next page]*

2. Assembly Bill 333's Amendments to Section 186.22

Section 186.22 makes it a crime to actively participate in a "criminal street gang." (§ 186.22, subd. (a).)  It also provides for enhanced punishment (gang enhancements) when an enumerated felony, including murder, was committed "for the benefit of , at the direction of, or in association with a criminal street gang . . . ."  (§ 186.22, subd. (b).)  Thus, neither the active gang participation statute (§ 186.22, subd. (a)), nor the gang enhancement statute (§ 186.22, subd. (b)) can be violated unless the crime involved a "criminal street gang."  Likewise, a gang-related firearm enhancement (§ 12022.53, subd. (e)(1)) requires proof that the defendant violated the gang enhancement statute (§186.22, subd. (b)), which includes proof that the crime involved "a criminal street gang."

Assembly Bill 333 amended section 186.22 to change the definition of "criminal street gang."  (Stats. 2021, ch. 699, § 3.)  Section 186.22 formerly defined "criminal street gang" as "*any ongoing organization, association, or group* of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity."  (Former § 186.22, subd. (f); Stats. 2017, ch. 561, § 178; italics added.)  The bill narrowed this definition to, "*an ongoing, organized association or group* of three or more persons . . . whose members *collectively* engage in,

---

also applies retroactively (*People v. Burgos* (2022) 77 Cal.App5th 550, 562, 564-568) and, if so, whether section 1109 requires us to vacate the gang conviction and gang-related enhancements (see *id*. at pp. 568-569 [reversing robbery convictions under any applicable standard of reversible error based on failure to bifurcate gang enhancement allegations from the robbery charges under § 1109 as retroactively applied]).

30

or have engaged in, a pattern of criminal gang activity." (Assem. Bill 333, § 3, revised § 186.22, subd. (f), italics added.)

The bill also changed the requirements for proving the "pattern of criminal gang activity" necessary to establish the existence of a criminal street gang. Formerly, "pattern of criminal gang activity" meant "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [predicate] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Former § 186.22, subd. (e); Stats. 2017, ch. 561, § 178.)

Now, however, a "pattern of criminal gang activity" requires proof of additional elements with respect to predicate offenses. (§ 186.22, subds. (e), (g).) Among other things, the predicate offenses must have "commonly benefited a criminal street gang" and the common benefit must be "more than reputational." (§ 186.22, subds. (e)(1).) Examples of a common benefit that are "more than reputational" include but are not limited to "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g), enacted by Stats. 2021, ch. 699, § 3.)

In addition, the most recent predicate offense must have occurred within three years of charged offense (not the most recent qualifying offense, as under prior law,), and the predicate offenses must have been committed on separate occasions or by two or more gang members (as opposed to persons, as under prior law). (§ 186.22, subd. (e)(1).)

31

The list of qualifying predicate offenses has also been reduced (*ibid.*), and the charged offense can no longer be used as a predicate offense (*id*. at subd. (e)(2)).

3. Application

At the jury trial, the parties entered into an evidentiary stipulation concerning the gang-related allegations on count 1.  The court relied on the same stipulation and facts stated in it in finding defendant guilty of the active gang participation charge (count 2) in the bifurcated trial.

There is no question that the stipulation and other evidence was sufficient to prove the criminal street gang element of the gang charge and gang-related enhancement allegations under former section 186.22.  Among other things, the stipulation stated that the Westside Verdugo, Varrio Redlands, Sureños, and Mexican Mafia were criminal street gangs within the meaning of former section 186.22, subdivision (f), and listed predicate offenses for each gang that met the requirements of former section 186.22, subdivision (e)(1).  (Stats. 2017, ch. 561, § 178.).

But neither the stipulation nor any other evidence showed that any of the alleged predicate offenses "commonly benefited a criminal street gang" in a way that was "more than reputational," as section 186.22, subdivision (e)(1) now requires.  (Assem. Bill 333, § 3, amended § 186.22, subd. (e)(1).)  This failure of proof is not surprising, given that no such showings were required to establish predicate offenses, or by extension a pattern of criminal gang activity and a criminal street gang, at the time of trial.  (Former § 186.22, subds. (e), (f).)  But as the parties agree, this failure of proof requires us to vacate

32

defendant's gang conviction in count 2 and the gang-related enhancements on his murder conviction in count 1 based on insufficient evidence.

The conviction and true findings must also be reversed based on instructional error concerning the new, common benefit showings required to establish predicate offenses and, by extension, a pattern of criminal gang activity and a criminal street gang. (§ 186.22, subds. (e)-(g).)  Of course, the jury and the court determined whether the alleged predicate offenses were proved based on former section 186.22, not the statute as amended by Assembly Bill 333.  Thus, in effect, neither the jury nor the court were instructed on the common benefit showings necessary to establish a predicate offense, specifically that the predicate offense must have commonly benefited a criminal street gang in a way that was more than reputational.  (§ 186.22, subds. (e)(1), (g).)

Instructional error that omits an element of an offense or enhancement is reviewed for prejudice under the standard of reversible error articulated in *Chapman*, *supra*, 386 U.S. 18.  (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 479 ["Because Assembly Bill 333 essentially add[ed] new elements to the substantive offense and enhancements in section 186.22 . . . [,] the prejudice standard articulated in" *Chapman* applies.]; *People v. Sek* (2022) 74 Cal.App.5th 657, 668 ["When jury instructions are deficient for omitting an element of an offense, they implicate the defendant's federal constitutional rights, and we review for harmless error under the strict standard of *Chapman* . . . ."].)  Under *Chapman*, "the absence of instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt that the error did not contribute' " to the verdict or findings.  (*E.H.*, at p. 479.)

As the People concede, "the parties' stipulations and the People's expert testimony contain no factual details about the predicate offenses consistent with Assembly Bill No. 333." That is, no evidence showed that any of the alleged predicate offenses "commonly benefited a criminal street gang" or that the common benefit to the gang was "more than reputational." (§ 186.22, subd. (e)(1), (g).) Nor, as noted, was the jury or the court aware, or effectively instructed, that these showings were necessary to establish each requisite predicate offenses and, by extension, a pattern of criminal gang activity and a criminal street gang. (§ 186.22, subds. (e)-(g).)

Thus, we cannot say that the retroactive instructional error in omitting the common benefit elements of the predicate offenses did not contribute to the court's verdict on the gang conviction or to the jury's true findings on the two gang-related enhancements. Rather, given the failure of proof on the common benefit elements of the predicate offenses, the verdicts and findings must have been based on the retroactive instructional error. Simply stated, the gang conviction and gang-related findings are based on former section 186.22, and insufficient evidence supports them under the current, retroactive provisions of the statute. Thus, based on both insufficient evidence and retroactive instructional error, defendant's gang conviction in count 2 and gang-related enhancements on count 1 must be vacated.[12]

---

[12] The parties dispute whether the gang conviction and gang-related enhancements must also be vacated because the parties' stipulation did not state, and no other evidence showed, that the Westside Verdugo, Varrio Redlands, Sureños, or the Mexican Mafia were criminal street gangs whose members "collectively," as opposed to "acting alone or together," engaged in, or had engaged in a pattern of criminal gang

*[footnote continued on next page]*

The People, however, are not precluded from retrying the gang charge or the gang-related enhancements allegations. "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury [or the court]—is to remand and give the People an opportunity to retry the affected" charge and enhancements. (*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480; *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand. [Citation.] Such a retrial is not barred by the double jeopardy clause or ex post facto principles . . . ."]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2.)

D. *Fines and Assessments*

Defendant challenges several fines and assessments imposed at his July 10, 2020 sentencing hearing. First, he argues, and the People and we agree, that the $2,000 parole revocation fine (Pen. Code, § 1202.45) is unauthorized and must be stricken because defendant's LWOP sentence on his murder conviction, together with the prior-murder

---

activity. (Cf. § 186.22, subd. (f) as amended by Assembly Bill 333 with former § 186.22, subd. (f).) Defendant claims the term "collectively" means that more than one gang member must have been involved in a predicate offense. (*People v. Lopez*, *supra*, 73 Cal.App.5th at pp. 345-346 [reversing true findings on gang enhancement allegations because no evidence showed that more than one gang member was involved in each predicate offense].) The People claim this reading of the statute is unsupported and, if newly amended subdivisions (e) and (f) of section 186.22 are read together, as they are required to be, then "evidence that two predicate offenses, each committed by individual gang members who were engaged in a collective purpose, satisfies Assembly Bill No. 333's requirement that they committed them 'collectively.' " It is unnecessary to address this question given that the gang conviction and gang-related enhancements must be vacated based on insufficient evidence that the predicate offenses commonly benefited of a criminal street gang in a way that was more than reputational. (§186.22, subds. (e)(1), (g).)

special-circumstance enhancement (§ 190.2, subd. (a)(2)) does not include a parole period (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181-1183).

Second, defendant claims that the $140 in per-conviction assessments on his convictions in counts 1 and 2, or $70 on each conviction (Gov. Code, § 70373 [$30 per conviction fee for court facilities]; Pen. Code, § 1465.8 [$40 per conviction fee for court operations]), and the $2,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), violate his due process rights under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) because the court imposed them without finding he was able to pay them.

Regardless of defendant's ability to pay the $70 in assessments on count 2, those assessments must be stricken because defendant's conviction in count 2 is being vacated. Regarding the $70 in assessments on count 1, the People argue that any *Dueñas* error was harmless beyond a reasonable doubt because "there is nothing in the record to indicate that [defendant] did not have the ability to pay the[se] relatively small fees." We agree. Although the court found that defendant was unable to reimburse the court for his appointed counsel fees and pre-sentence investigation costs, the record indicates that defendant will be able to pay the $70 fee from prison earnings over time. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069-1072.) Defendant is young. He was 37 years old at the time he was sentenced in 2020, and the record does not show that he has any physical disabilities or is otherwise unable to work.

Regarding the $2,000 restitution fine, the People argue that the excessive fines clause of the Eighth Amendment, rather than *the Dueñas* decision, provides "the proper analytic framework" for assessing whether punitive restitution fines are excessive.

(*People v. Kopp* (2019)  38 Cal.App.5th 47, 96-98, review granted Nov. 13, 2019, S257844; *People v. Hicks* (2019) 40 Cal.App.5th 320, 324-329, review granted Nov. 26, 2019, S258946; *People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1069.)  Under this analytic framework, the People argue, the $2,000 restitution fine is not excessive.

It is unnecessary to decide this question in this case.  Even if the $2,000 restitution fine is not excessive under the excessive fines clause, there is an overriding reason why the $2,000 restitution fine must be stricken, without prejudice to the court recalculating and imposing a new restitution fine on remand:  the calculation of the $2,000 restitution fine may have been based, in part, on defendant's now-vacated gang participation conviction in count 2 and the two gang-related enhancements on count 1, and the sentences on each of them.  The amount of the restitution fine is left to the court's sound discretion and must be commensurate with the seriousness of the offense.  (§1202.4, subd. (b)(2).)  In setting the restitution fine, the court may, but is not required to, use the formula set out in section  1202.4, subdivision (b)(2).  That section provides that "the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) [$300 for a single felony conviction] multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."  (1202.4, subd. (b)(2).)

When the court calculated the $2,000 restitution fine at sentencing on July 10, 2020, defendant stood convicted in count 2, and the court was sentencing him to 25 years to life on the gang-related firearm enhancement on count 1.  (§ 12022.53, subds. (d), (e)(1).)  The record does not show that the conviction in count 2, or the

37

unstayed sentence on the gang-related firearm enhancement on count 1, did not form part of the $2,000 restitution fine. (See § 1202.4, subd. (b).) Thus, we strike the $2,000 restitution fine in its entirety, without prejudice to the court recalculating and imposing a new restitution fine on remand, regardless of whether the People elect to retry defendant on the active gang participation charge in count 2, the gang-related enhancement allegations on count 1, or the gang-related special circumstance allegation on count 1.

## IV. DISPOSITION

Defendant's active gang participation conviction in count 2 (former § 186.22, subd. (a)) and his two gang-related enhancements on his murder conviction in count 1 (Former §§ 186.22, subd. (b), 12022.53, subds. (d), (e)(1)) are vacated. Defendant's murder conviction in count 1 and the true finding on the prior-murder special-circumstance allegation on count 1 are unaffected by this decision.

The matter is remanded to the trial court for further proceedings. The People shall have 60 days from the date of the remittitur in which to file an election to retry defendant on the active gang participation charge, the two gang-related enhancement allegations on the murder charge, and the gang-related special circumstance allegation on the murder charge, on which no finding was made. If the People elect not to retry defendant on the gang charge or either gang-related enhancement allegation, the court shall modify the judgment by striking the affected conviction and enhancement(s) and resentence defendant accordingly.

The $2,000 restitution fine, the $2,000 parole revocation restitution fine, and the $70 in per-conviction assessments on count 2 are stricken. On remand, the court may

38

recalculate and impose a new restitution fine (§ 1202.4, subd. (b)) regardless of whether the People elect to retry defendant on count 2, the gang-related enhancements on count 1, or the gang-related special circumstance allegation on count 1. Following the conclusion of proceedings on remand, the court is directed to amend defendant's abstracts of judgment (determinate and indeterminate) in a manner consistent with this disposition and to forward copies of the amended abstracts to Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:


McKINSTER _____
                Acting P.J.


MILLER _____
                J.

39